**WOMEN'S MEDICAL CENTER OF PROVIDENCE, INC.**

v.

**Dennis J. ROBERTS, II, et al.**

**PLANNED PARENTHOOD OF RHODE ISLAND**

v.

**Dennis J. ROBERTS II, et al.**

**Civ. A. Nos. 80–292, 80–334.**

United States District Court, D. Rhode Island.

Jan. 15, 1982.

**1138**

Lynette Labinger, of Abedon, Michaelson, Stanzler, Biener, Skolnik & Lipsey, Deming E. Sherman, of Edwards & Angell, Providence, R.I., for plaintiff.

Joseph R. Palumbo, Jr., of Moore, Virgadamo & Lynch, Ltd., Newport, R.I., Mary Ellen McCabe, Chief Counsel, R.I. Department of Health, Providence, R.I., for defendants.

## OPINION

PETTINE, Chief Judge.

This is a consolidated action for declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 challenging the constitutional validity of Rhode Island General Laws Title 23, Chapter 4.7 entitled "Informed Consent for Abortion."[1] Plaintiffs allege violations

1. Rhode Island's informed consent statute provides as follows:

R.I.G.L. 23–4.7–1. Time of Consent.—An abortion permitted by law shall be performed only with the informed written consent of the woman at least twenty-four (24) hours prior to the scheduled operation. In the event the scheduled operation is delayed for good medical cause, then the twenty-four (24) hour requirement shall not apply if the informed written consent has been previously complied with in the same seven (7) day time period prior to the scheduled operation.

The prescribed waiting period may be waived where there is an emergency requiring immediate action. The attending physician shall certify in writing the patient's medical record as to the emergency and the medical basis for his opinion.

Simple compliance with the time requirements of this section shall not be prima facie evidence of informed consent.

R.I.G.L. 23–4.7–2. Required disclosure.—In order to insure that the consent of the pregnant woman is *truly informed* consent, an abortion shall be performed only after the woman has signed a consent form acknowledging that she has been informed *by the physician* who is to perform the abortion as follows:

(1) That she is pregnant and a copy of her pregnancy test is available to her.

(2) That the nature of an abortion has been fully explained, including the probable gestational age of the fetus at the time the abortion is to be performed.

(3) That the medical or surgical procedure to be used has been explained, to include all medical risks, both physical and psychological, associated with the particular abortion procedure to be employed, consistent with good medical practice.

(4) That the printed information prescribed in § 23–4.7–4 is available, if in fact it has been made available by the department of health.

(5) That the woman be informed of all medical risks, both physical and psychological, to herself and the fetus, associated with the alternative of carrying the fetus to term, consistent with good medical practice.

In addition, the physician may inform the woman of any other material facts or opinions or provide any explanation of the above information, which in the exercise of his best medical judgment, is reasonably necessary to allow the woman to give her informed consent to the proposed abortion, with full knowledge of its nature and consequences.

In cases where the woman does not understand English, either the consent form shall be written in a language understood by her, or the physician informing her shall certify on the consent form that in his or her opinion, the information required in this section has been given in such a manner as to be understandable by her; if an interpreter is used, the interpreter shall be named and reference to such use shall be made on the consent form.

R.I.G.L. 23–4.7–3. Consent form requirements—Duties of physician.—The consent form shall comply with the requirements of § 23–4.7–2. A copy shall be made available to her upon her request.

R.I.G.L. 23–4.7–4. Printed information.—The department of health shall, within sixty (60) days after this section becomes law, cause to be published, printed materials that may be easily comprehended in all languages used by significant portions of the population of this state:

(1) Materials designed to inform concerned persons of public and private agencies and services available to assist a woman through pregnancy, upon childbirth and while the child is dependent, including a comprehensive list of the agencies available and a description of the manner in which they might be contacted; and

of rights secured by the First, Fourth, Ninth and Fourteenth Amendments to the United States Constitution. This Court's jurisdiction stems from 28 U.S.C. §§ 1331(a), 1343(3), 2201, and 2203.

The plaintiffs are Women's Medical Center of Providence, Inc., (WMC), a medical clinic which provides gynecological services, including abortions during the first trimester, Planned Parenthood of Rhode Island (PPRI), a non-profit organization which also provides gynecological services, including abortions during the first trimester, and a class of physicians who perform abortions at clinics, in their offices, and in hospitals in Rhode Island.

### Standing

In a preliminary ruling on April 21, 1981, I held that all of the plaintiffs have standing to challenge the Act in question. *Women's Medical Center of Providence, Inc. v. Roberts*, 512 F.Supp. 316, 320–21 (D.R.I. 1981). I have also ruled that all plaintiffs may assert not only their own rights but also the constitutional rights of their patients—women who seek legal abortions—in challenging the Rhode Island enactment. *Id.* at 321–25. The hearing on the merits has not caused me to change my previous opinion and I see no need to reiterate what

I said when I first denied defendants' motions to dismiss for lack of standing. Accordingly, I incorporate the reasoning of the prior opinion into this one and hold that plaintiffs have standing to challenge the Act.

The Rhode Island enactment in question governs the manner and time frame within which informed consent for an abortion must be given in Rhode Island.[2] The various sections of the Act may be summarized as follows. The statute requires that a physician convey certain information to the patient. This information includes verification that the woman is pregnant and that a copy of her pregnancy test is available to her; a description of the nature of an abortion, including the probable gestational age of the fetus; an explanation of the procedure involved and of "all medical risks" associated with that procedure; an explanation of "all medical risks" to both the mother and the fetus associated with carrying the fetus to term; and a statement that information concerning abortions printed by the State Department of Health is available to the patient.

### I. Factual Background

Women's Medical Center, Inc. provides complete reproductive health care for wom-

---

(2) Materials designed to inform concerned persons of the probable anatomical and physiological characteristics of the fetus at the various gestational ages at which abortion might be performed, including any relevant information on the possibility of fetal survival.

R.I.G.L. 23–4.7–5. Liability of physician.—A physician who intentionally, knowingly or recklessly violates the requirements of § 23–4.7–2 shall be fined not more than five hundred dollars ($500), or imprisoned for not more than one (1) year, or both. Failure to provide the woman with the substance of the information pursuant to the requirements of § 23–4.7–2 shall be prima facie evidence of failure to obtain informed consent in an action at law, or in equity.

R.I.G.L. 23–4.7–6. Severability.—If any section or provision of this chapter or the application thereof is held invalid, such invalidity shall not affect other sections, provisions or applications, and to this end the sections and provisions of this chapter are hereby declared severable.

**2.** *See* note 1 *supra.* Just prior to the hearing in this case, the Rhode Island legislature amended the informed consent for abortion statute by adding § 23–4.7–3.1. The new section provides:

> *Parental Notification for Minors*—In the case of a pregnant minor, the physician shall exercise reasonable diligence to notify the parent or legal guardian of the minor prior to performing the abortion, if feasible and practicable.

After obtaining a copy of this amendment, plaintiffs moved to amend their complaint to add a challenge to this section. By agreement of the parties, enforcement of the amended statute has been suspended, *see Women's Medical Center of Providence, Inc. v. Roberts*, 512 F.Supp. 316, 317 n.2 (D.R.I.1981), and a separate hearing on the constitutionality of 23–4.7–3.1 will be conducted at a later date. At this time I express no opinion whatsoever on the constitutionality of 23–4.7–3.1.

en. As its primary activity, the clinic provides first trimester abortions using the dilatation and suction-curettage method.[3] The cost for such abortions is at most $175.00 and may be less, depending on the circumstances of the patient. The clinic employs a rotating staff of four part-time physicians. The clinic also utilizes a full-time support staff including an administrator, a counsellor, nurses, medical assistants and technicians. About 50 abortions are performed every week on Tuesdays, Fridays, and Saturdays. Based on their rotating schedules, each physician spends about five days per month, one to two days per week, at the clinic. The remainder of the physicians' time is spent in private practice or fulfilling other professional commitments.

In general, a woman desiring a first trimester abortion first contacts Women's Medical Center by phone. At this point, the receptionist questions the caller to determine whether the woman has had time to think about her decision and to find out when the woman's last normal menstrual period (LMP) began.[4] Having elicited this information, the receptionist gives the caller an overall perspective on the functioning of the clinic. In short, the receptionist informs the patient of what to expect when she arrives at the clinic and of the procedure followed by the clinic. All other questions are deferred to the time of an appointment which is made if the caller states that she still desires to go through with her decision. The appointment generally is not scheduled for the same day on which the call was received but is scheduled as soon as possible after the call is received. If seven

and one-half weeks have not elapsed since the patient's LMP, the appointment is made for the first available abortion day after seven and one-half weeks have passed.

When a woman arrives at the clinic on the appointed day, she first fills out a portion of a medical chart, providing various personal information and a medical history. Upon her completion of this chart, the patient's vital signs are taken and her chart is reviewed for completeness. At this point the clinic also conducts a lab test to confirm the patient's pregnancy. This lab test includes blood typing and venereal disease tests.

Following the lab tests and confirmation of pregnancy, the patient participates in a group counselling session with four or five other women, which is led by the clinic's counsellor. The counsellor goes through the entire abortion process from the time the patient enters the clinic to the time of their follow-up visit about two weeks after completion of the abortion procedure. The counsellor also explains exactly what the doctor will do and how the dilatation and curettage (D&C) method of pregnancy termination works. Included in the discussion is an examination of the risks associated with the surgical procedure. The patients are free to ask questions about anything or share their fears and concerns with the other women in the group. If a patient asks a question that the counsellor cannot answer, one of the doctors is consulted, and an answer is always given before an abortion is performed. The group session lasts from forty-five minutes to one hour.

---

3. This method of performing an abortion is also known as the "vacuum aspiration" method. To perform this type of an abortion, the physician usually injects a local anesthetic into the cervix. Following this, the physician gradually stretches the opening in the cervix with a series of long, narrow rods—known as dilators—each somewhat wider than the one before. When the cervical opening has been sufficiently dilated, the physician inserts a blunt-tipped tube into the uterus. This tube is then attached to a suction machine and the products of conception are emptied from the uterus by a gentle suction. After completing this stage, the physi-

cian may use a spoon-shaped curette to clean the lining of the uterus. The operation takes from five to seven minutes to complete.

4. The woman's last menstrual period is used to calculate how far her pregnancy has progressed. Generally, a first trimester abortion will not be performed until seven and one-half weeks after the first day of a woman's last menstrual period. The gestational age of the fetus can be approximated by subtracting two weeks from the time elapsed since the beginning of the woman's period.

Once the group counselling session is completed, each woman meets individually with the clinic counsellor or administrator during which the woman may raise any concerns that she did not feel comfortable raising in a group setting. If the woman expresses a desire to go through with the procedure, a consent form is discussed and signed in the presence of either the counsellor or the administrator. If the patient expresses ambivalence or wants more time to consider her decision, she is free to depart at any time. In fact, the clinic staff will not allow a woman to proceed until she has satisfied them that she knows exactly what she is doing and has consented fully. One physician testified that he has refused to perform abortions even after a woman has reached the operating table because he has perceived indecision.

When the consent form has been signed, the patient proceeds to the procedure room where, usually for the first time, she will meet the physician who will perform the abortion. In general, the physician conducts a pelvic examination, describes what he or she will be doing, and asks the woman if she has any questions or concerns regarding the abortion. If so, the physician will discuss them in whatever detail he or she deems necessary. The actual abortion procedure takes roughly five to seven minutes to complete. When the physician is finished, the patient is accompanied to the recovery room where she stays for about another forty-five minutes. During this time, she is instructed about post-procedure care and birth control. Finally, the patient schedules a two-week check-up before she leaves the clinic.

The Planned Parenthood process is similar to that used by Women's Medical Center. Its one big difference is that it requires two visits to the clinic; a pre-abortion clinic visit and the abortion visit. For the purposes of this opinion there is no need to detail them. Suffice it to say that they include examination, counselling by non-doctors, explanation by one not necessarily a doctor of the procedures, possible complications, financial arrangements, and affirmation of consent to have the abortion, and

follow-up examination and counselling. There is no contest in this case as to the adequacy of the methodology used by the clinics or the competency of their doctors.

A woman might also choose to have an abortion performed by a doctor in private practice. Such doctors follow a more or less typical procedure. A woman usually phones her doctor and schedules an appointment. The woman then is instructed to appear at the office on a given date with a urine specimen. Upon arrival, she completes the necessary paper work, if she has not done so before, and is then interviewed by an administrator/nurse. During this interview, the nurse goes over the consent form and discusses the risks of the abortion procedure. The woman may ask questions and express concerns during this session. Following the interview, the administrator/nurse witnesses the patient sign the consent form. The patient then meets the physician, who performs a complete physical examination. After this, the doctor follows up with a meeting in his office during which he discusses any questions the patient has and recommends birth control measures for the future. The doctor then typically schedules an appointment for the abortion. Because the abortion must be performed in a hospital, however, the patient may have to wait seven to ten days before the pregnancy can be terminated. Of course, if an emergency situation exists an accelerated date may be available. The termination procedure in the hospital approximates the procedure usually performed in the clinics discussed above. The costs for a first trimester D&C procedure by a doctor in private practice would be approximately $145.00 for the hospital costs and $150.00 for the physician, making the total cost approximately $300.00.

WMC introduced evidence that the present Rhode Island statute, if enforced, will cause patients to go to Massachusetts for abortions rather than make two trips 24 hours apart to the Rhode Island clinic. On the other hand, the state argues that women who seek abortions from PPRI must visit the clinic at least two separate times

and that this fact proves the burden imposed by the State's mandatory twenty-four hour waiting period is reasonable and certainly not burdensome. However, the administrator of PPRI testified that the clinic will soon initiate a same-day service similar to the one offered by WMC.

Other evidence introduced by WMC and not substantially impeached by the defendants was that "the cost to the patient would be increased because there would be a necessity for more staff, the clinic would have to remain open longer and the cost of the physician would increase due to the requirement of two visits to the physician.... [T]he doctor would have to be at the clinic for two sessions (rather than one) for each patient. [As it now stands paraprofessionals on the staff convey the informed consent and other basic information to patients]." All this means increased cost to the patient and, since the present staff of doctors at the clinic is on a part-time basis in conjunction with their private practice, the two-day visit will present problems finding doctors willing to devote the extra time.

The plaintiffs also produced evidence showing that there are 25–30 physicians in Rhode Island who perform abortions, but only 5–6 of them will perform such a procedure between 13 and 14 weeks. Consequently, a patient who passes into the second trimester may have to wait an additional month and, because she is in the second trimester, go to a hospital. This, of course, makes such an abortion more expensive than one in the first trimester.

The testimony at trial also indicated that first trimester abortions are less risky than those in second trimester. Furthermore, if performed before the 10th week of pregnancy, abortions are safer for a woman than carrying a child to term.

Commenting on the statute at issue, Dr. DiOrio of WMC stated the 24–hour waiting period interferes with the patient's well-being. Ninety-five percent of all the patients he sees have searched their souls before making the decision to terminate their pregnancy. He also pointed out that it is unnecessary to disclose all medical risks because it cannot be done "without reading off a textbook of potential complications, no matter what the procedure would be, and then supplementing that with recent journal articles where newer complications that are now not yet in textbooks have been found to occur." He further testified that it is equally unnecessary to tell patients all medical risks associated with carrying a fetus to term, and that there is, in his medical opinion, no reason for requiring a broader explanation for abortion than for other surgical procedures. Finally he said that the statute's required explanation of "psychological risks to the fetus" has no meaning to him as a physician, and that he would not know how to comply with this requirement. Equally needless, he felt, is the requirement that the physician who performs the procedure be the same physician who makes the required disclosures. Other medical evidence established that the utilization of paraprofessionals is a necessary and desirable trend in medicine and a distinct benefit to patients, and is consistent with good medical practice when properly executed.

The plaintiffs also established, through medical testimony, that it is not necessary, in order to obtain an informed consent, that the patient be told of the anatomical and physiological characteristics of the fetus and its chances of survival. The plaintiffs' evidence indicated that the exposure to such information in a few cases may change the patient's mind, but in many other cases will increase unnecessarily the psychological burden of making the decision.

The defendants attempted to refute plaintiffs' case with contrary testimony. This testimony, which the Court ultimately found unpersuasive included the following: a) that the term "consistent with good medical practice" in subsection 5 of the Act is broad enough to relieve a physician of the statutory obligation to disclose information which is medically irrelevant to informed consent; b) that the requirement that the physician who is to perform the procedure must also provide the disclosure is medically necessary and in keeping with good medical

practice; and c) that the 24-hour waiting period is based upon the sound realization that a patient is propelled by the momentum of events to proceed with the abortion without an appropriate cooling off period.

## The Legal Standard

Before discussing each requirement of the Rhode Island statute, it is necessary that I establish the applicable legal standard. This standard was first established in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), and further expounded in *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), and *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). These cases hold that a woman's right to decide whether or not to terminate her pregnancy is a fundamental right, bound up with the rights of privacy implicit in the "liberty." component of the due process clause of the Fourteenth Amendment. Hence, only compelling state interests can justify any state limitations. *Roe v. Wade, supra,* 410 U.S. at 155, 93 S.Ct. at 727; *Akron Center for Reproductive Health, Inc. v. City of Akron,* 479 F.Supp. 1172, 1200 (N.D.Ohio 1979), *aff'd in part, rev'd in part,* 651 F.2d 1198 (6th Cir. 1981). *See Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d 1006, 1016 (1st Cir. 1981) ("[W]ithout deciding whether the interest asserted has been shown to be compelling, we conclude that the state has failed to establish that the [statutory provision] is 'necessary' to serve that interest.") However, certain insignificant or *de minimis* burdens on the right are permissible and will not trigger strict scrutiny of the relevant enactment. *Charles v. Carey,* 627 F.2d 772, 777 (7th Cir. 1980).[5]

---

**5.** I agree with the Seventh Circuit that the concept of "undue burden" used by the Supreme Court in analyzing some recent cases involving alleged restrictions on the right to an abortion causes some confusion regarding the standard to be applied in cases involving first trimester restrictions. *See Charles v. Carey,* 627 F.2d 772, 777–78 (7th Cir. 1980). The confusion appears to stem from attempts to reconcile the position taken by the Court in *Roe v. Wade,* which arguably holds that there are no compelling state interests that ever justify a state-imposed burden on the right to a first trimester abortion, with the Court's position in *Danforth* that limited informed consent requirements may be imposed by the state during the first trimester, and with its position in *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977) and *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), that the state may discourage indigents from exercising their right to an abortion by refusing to pay for the procedure. Contrary to the clear indications in *Wade* and *Bolton,* the Court in its later cases has allowed some state enactments that regulate the first trimester abortion decision.

Two approaches have emerged as lower federal courts have struggled with the line of Supreme Court abortion decisions. One approach focuses on some Supreme Court language to the effect that if a regulation does not "unduly burden" the first trimester decision, it will be upheld. *See Maher v. Roe,* 432 U.S. at 473, 97 S.Ct. at 2382; *Bellotti v. Baird,* 428 U.S. 132, 147, 96 S.Ct. 2857, 2866, 49 L.Ed.2d 844 (1976). Courts taking this approach conclude from this language that the first inquiry to be undertaken is whether a law "unduly burdens" a woman's right to an abortion. If this threshold determination of undue burden is met, then strict scrutiny applies; if not, the state's justification need only meet the rational relationship test. *See Akron Center for Reproductive Health, Inc. v. Akron,* 479 F.Supp. 1172, 1200 (N.D.Ohio), *aff'd in* part, *rev'd in part,* 651 F.2d 1198 (6th Cir. 1981); *Women's Community Health Center, Inc. v. Cohen,* 477 F.Supp. 542, 545 (D.Me. 1979).

The second approach stems from a different perspective. In these cases, the courts determine whether the law or regulation imposes a significant or non *de minimis* burden on the woman's exercise of her fundamental right. If such a burden is not imposed by the regulation, then the law need satisfy only the relaxed standard of reasonableness. However, if a sufficient degree of interference with the abortion decision can be shown, the regulation has to be supported by a compelling state interest and must be narrowly tailored to serve that interest. *See, e.g., Akron Center for Reproductive Health, Inc. v. Akron,* 651 F.2d 1198, 1204 (6th Cir. 1981); *Planned Parenthood League of Mass. v. Bellotti,* 641 F.2d 1006, 1014–15 (1st Cir. 1981); *Charles v. Carey,* 627 F.2d 772, 777 (7th Cir. 1980). I believe that the latter approach represents the better approach in reviewing these statutes. I am persuaded by the reasoning of the Seventh Circuit in *Charles v. Carey:*

[T]he term "undue burden" defines the ultimate constitutional issue, not merely the threshold requirement for strict scrutiny. When describing specifically the burden of

Balancing a woman's rights against the state interests, the Supreme Court has divided pregnancy into three trimesters. During the first trimester, no non-*de minimis* burdens on the abortion decision have been permitted. *See Colautti v. Franklin,* 439 U.S. 379, 387, 99 S.Ct. 675, 681, 58 L.Ed.2d 596 ("[U]p to the points where important state interests provide compelling justifications for intervention, 'the abortion decision in all its aspects is inherently, and primarily, a medical decision....'"). During the first three months, once the decision is made, the state cannot interfere with its effectuation, except to enhance, in a very limited and nonburdensome way, the medical aspects of the patient-physician decision-making process. *See Planned Parenthood of Central Missouri v. Danforth, supra,* 428 U.S. at 67, 81, 96 S.Ct. at 2840, 2846 (upholding a minimal informed consent requirement that applied to the first trimester and a record-keeping requirement that applied to all abortions regardless of trimester because the Court found "no legally significant impact or consequence on the abortion decision or on the physician-patient relationship"). When a woman reaches the second trimester of pregnancy, the state "in promoting its interest in the health of the mother, may, if it chooses, regulate the abortion procedure in ways reasonably related to maternal health." *Roe v. Wade, supra,* 410 U.S. at 164, 93 S.Ct. at 732. Finally, the third trimester of pregnancy has been characterized by the Supreme Court, for purposes of constitutional analysis, as "viability." At this point the state "in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary" to preserve the life of the mother. *Id.* at 164–65, 93 S.Ct. at 732.

Because the Rhode Island statute does not differentiate among trimesters, the appropriate standard of review is that applicable to the first trimester. *See, e.g., Women's Services P.C. v. Thone,* 483 F.Supp. 1022, 1044 (D.Neb.1979), *aff'd per curiam,* 636 F.2d 206 (8th Cir. 1980), *vacated and remanded,* 452 U.S. 911, 101 S.Ct. 3043, 69 L.Ed.2d 414 (1981). Thus, if the statute creates a substantial, non-*de minimis* interference with a woman's right to an abortion, Rhode Island must demonstrate a compelling state interest to justify the interference. *See* note 5 *supra.*

The outside parameters of what a state may do during the first trimester have been set. For example, in *Danforth* the Supreme Court upheld the *de minimis* interference created by minimal informed consent and record keeping, which did not obstruct a meaningful physician-patient consultation and did not seek to influence the outcome of the woman's final decision. (I note, however, that the Court found that even these requirements "approach[ed] impermissible limits." *Danforth, supra,* 428 U.S. at 81, 96 S.Ct. at 2846.) Furthermore, in *Maher v. Roe, supra,* 432 U.S. at 473–74, 97 S.Ct. at 2382, and *Harris v. McRae, supra,* 448 U.S. at 315–16, 100 S.Ct. at 2687–88 the Court declared that states could constitutionally refuse to pay for both non-therapeutic and medically-necessary abortions. The Supreme Court reasoned that these kinds of budgetary decisions simply place no governmental obstacle in the path of a woman who chooses to terminate her pregnancy.

Having analyzed these and other cases establishing the limits of state interference with the abortion decision, I find that most of the Rhode Island statute exceeds these limits. As I read the statute at issue, it clearly imposes legally significant, non-*de minimis* burdens on the right of a woman, in consultation with her physician, to decide to terminate her pregnancy. Furthermore, the state has not shown a compelling interest to justify its intrusion.

the party challenging a state regulation, the Supreme Court has not used the term "undue" .... The threshold question whether there is a "burden" or "direct interference" in the pregnancy termination decision requires the plaintiff merely to show the requisite degree of interference. If the interference is sufficiently substantial and not de minimis, the State has to show the compelling basis for the law, that is, that the burden is not "undue" or unjustifiable.
627 F.2d at 777 (citations omitted).

*Void for Vagueness—Criminal Nature of the Statute*

To begin, we must not lose sight of the criminal nature of the statute, and thus the need for its precision. An intentional, knowing, or reckless violation of this statute by a physician can result in his imprisonment for up to one year. Such a statute must give a person of ordinary intelligence fair notice that his conduct is forbidden by the statute; it must not be so indefinite that it encourages arbitrary and erratic convictions—especially where the law threatens to inhibit the exercise of constitutionally protected rights. *Colautti v. Franklin*, 439 U.S. 379, 390, 99 S.Ct. 675, 683, 58 L.Ed.2d 596 (1979).

The law before this Court requires that a woman be informed of "all medical risks" associated with the "abortion procedure" and of all "medical risks," both physical and psychological, to herself *and to the fetus*, associated with the alternative of carrying the fetus to term. I find that these requirements are sufficiently ambiguous to serve the subjective prosecutorial whim of law enforcement and are void for vagueness.

The Court notes first that the statute fails to define "abortion." Without a precise statutory definition, the term "abortion procedure" is overly broad and vague. "Abortion" is not self-defining and may include both doctor-induced and spontaneous fetal loss. *See Wynn v. Scott*, 449 F.Supp. 1302, 1328–30 (N.D.Ill.1978), *aff'd sub nom. Wynn v. Carey*, 599 F.2d 193 (7th Cir. 1979) (finding term "miscarriage" impermissibly vague). Furthermore, a physician can be said to "perform" an "abortion" both when he initiates the termination of a pregnancy and when he performs an operation to complete an otherwise incomplete, spontaneous miscarriage. Such ambiguity does not afford persons a reasonable opportunity to conform their conduct to the law and cannot be tolerated. *Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 620, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976). Because this central term does not pass constitutional muster, the entire stat-

ute must fall, except for § 23–4.7–4, which merely requires that the Rhode Island Department of Health publish certain information.

The term "all medical risks" also prevents compliance with the law. Dr. Stubblefield, Chief of the Division of Ambulatory and Community Medicine and the Department of Obstetrics and Gynecology at Brigham and Women's Hospital and Assistant Professor of Obstetrics and Gynecology at Harvard Medical School testified that if he were trying to practice medicine under the statute he would be "terrified." Modern medical science is advancing rapidly, and new risks associated with undergoing an abortion are constantly being discovered. Thus, no physician can know with certainty exactly what the term "all medical risks" requires him at any moment to disclose to a patient. Such uncertainty in a criminal statute is impermissible.

Finally, the plaintiffs offered medical testimony that the term "psychological risks to the fetus" associated with the alternative of carrying to term is meaningless. Doctors simply would not know what to say to a patient. I thus find this statutory term also unconstitutionally vague because "it simply has no precise meaning." *Wynn v. Scott, supra*, at 1313.

*The 24-Hour Waiting Period*

R.I.G.L. § 23–4.7–1, entitled "Time of Consent," mandates that a woman seeking an abortion give her informed written consent to the termination "at least twenty-four (24) hours prior to the scheduled operation." The majority of federal courts have held such mandatory waiting periods unconstitutional. *See, e.g., Akron Center for Reproductive Health, Inc. v. City of Akron*, 651 F.2d at 1208; *Planned Parenthood League of Massachusetts v. Bellotti, supra*, at 1014–16; *Charles v. Carey, supra*, at 785–86.

Rhode Island's mandatory waiting period constitutes a direct state limitation on a woman's right to have an abortion. Simply put, the state requires that, regardless of a woman's frame of mind, despite her doc-

tor's contrary medical judgment, regardless of whether she previously had an abortion, and notwithstanding her possible medical sophistication, a woman seeking an abortion must, after giving her informed consent to the procedure, wait at least twenty-four hours before having the operation. It is difficult to argue that such an intrusion by the state does not unconstitutionally burden the abortion decision.

The state, however, contends that the 24-hour requirement does *not* burden this right because women who seek abortions from PPRI must visit the clinic at least two times. I disagree. Although PPRI now requires two visits, WMC does not. Absent the statutory waiting period, a woman could have her abortion performed in WMC's "same day" facility. The statute therefore deprives a woman of the shorter WMC option, thus burdening her right to an abortion. Furthermore, as noted earlier, PPRI plans to begin same day service similar to that at WMC.

The Court must now evaluate the significance of the burden that the 24-hour waiting period imposes. The evidence of burden in this record is virtually identical to that relied upon by the First Circuit in *Bellotti*. As in *Bellotti*, delay increases the risk to the patient. Although a mere twenty-four hour delay by itself may not increase the risk of an abortion to a statistically significant degree, the record in this litigation shows that the mandatory wait may combine with other scheduling factors such as doctor availability, work commitments, or sick leave availability, to increase the actual waiting period to a week or more. And, it is uncontested that delays of a week or more do indeed increase the risk of an abortion to a statistically significant degree. *See* Center for Disease Control, *Abortion Surveillance* 48, Table 20 (1980). The evidence to this effect is virtually uncontradicted. Furthermore, a delay of even twenty-four hours may push a woman into the second trimester, thus requiring that the operation be performed in a hospital, and significantly increasing the procedure's cost, inconvenience, and, of course, risk.

In addition to delay, the 24-hour waiting period "imposes substantial ancillary burdens on a woman's right to have an abortion." *Planned Parenthood League of Massachusetts v. Bellotti, supra*, at 1014. For example, it is uncontested that the waiting period requirement will necessitate two visits to an abortion facility for every woman seeking an abortion. For the woman with a distance to travel or with other commitments, the twenty-four hour wait may make having an abortion inconvenient and burdensome. Furthermore, combined with other provisions of the Rhode Island informed consent scheme, the twenty-four hour wait may aggravate the already difficult problem of finding enough doctors to staff abortion clinics adequately. The Rhode Island statute contains a provision requiring the same doctor who obtains a woman's informed consent to perform the actual abortion. As currently staffed, WMC and PPRI simply cannot schedule their part-time staff of doctors so as to make the same doctor who obtains informed consent available on some day later in the week to perform the actual abortion. Moreover, because obtaining more part-time doctors has proved very difficult for these clinics, the provisions of the Rhode Island statute may force them to schedule fewer abortions. Hence, the combined effect of the "same doctor" and waiting period requirements may be further delay in obtaining an abortion and a concomitant increase in the risk associated with the procedure.

Because the 24-hour period has more than a *de minimis* effect on a woman's abortion decision, the state must demonstrate a compelling interest to justify this substantial interference. Furthermore, Rhode Island must show that the waiting period is necessary, that is, narrowly tailored to serve its interest. The state argues that the 24-hour period promotes the state's interest in ensuring that a woman make a truly "informed" abortion decision. Rhode Island argues that the waiting period provides a time within which a woman can reflect cooly on the medical risks that the physician must disclose to her during their first meeting.

Whether the state's interest in providing a period of reflection is compelling or not, a question that I need not decide, the waiting period requirement must fall because it is not necessary to serve that interest. *Planned Parenthood League of Massachusetts v. Bellotti, supra*, at 1016. The testimony of Doctors D'Orio and Stubblefield establishes both that most women undergo intense "soul searching" prior to requesting an abortion, and that approximately 95% of them have made up their minds before seeing a physician. Stubblefield testified that there is "nothing that we [doctors] can do to change [their minds]." Thus, as the First Circuit found in *Bellotti*, the mandatory waiting period may not lead to further reflection, *id.* at 1016, and "in light of the extensive consideration that most women have given the abortion decision in advance, . . . truly informed consent [cannot be said to be] impossible or even unlikely without the mandatory delay." *Id.* In short, based on all of the above, I must conclude that the twenty-four hour waiting period in the Rhode Island statute imposes a "legally significant" burden on a woman's fundamental right to choose to terminate her pregnancy, and that the state has not demonstrated that imposition of the twenty-four hour waiting period is necessary to any compelling state interest.

*7-Day Expiration of Consent*

In addition to requiring a twenty-four hour waiting period, R.I.G.L. § 23–4.7–1 also places a seven-day "cap" on the period during which a woman's consent remains valid. This 7-day cap will require a woman who fails to have her abortion within 7 days of signing the consent form to be instructed a second time about the risks of undergoing the operation. This second explanation may require between 30 and 45 minutes of clinical staff time and may increase the costs of an abortion. The Court need not, however, decide whether such extra time and cost constitutes more than a *de minimis* burden on the abortion decision, thus triggering the compelling state interest test. The Court is unable to discern even a *rational* reason for imposing the 7-day cap, for the Court finds it highly improbable that a woman would forget about the medical risks explained to her just seven days earlier. Thus, because the 7-day cap is not even rationally related to a legitimate state interest, it fails to pass constitutional muster.

*Same Physician Requirement*

The "Required disclosure" section of the Act provides that the doctor who is to perform the abortion must make the necessary disclosures to the patient. This requirement, like the mandatory twenty-four hour waiting period, represents a direct state intrusion into a woman's abortion decision and into the doctor-patient relationship that plays such an important role in the decision. But for this provision, a doctor who performs abortions would retain the flexibility to train and supervise counsellors or nurses to perform the informing function. A doctor could also, if necessary, arrange for a colleague to perform either the informing function or the surgery.

> The burdensomeness of this requirement is evident. A woman may well consult in the first instance with her personal physician in reaching her decision. Under this "same doctor" rule, if that physician refers the woman to another doctor for the actual abortion operation, the woman will nevertheless have to undergo the expense and inconvenience of another pregnancy test and informed consent procedure. *Charles v. Carey, supra* at 784.

This particular enactment operates to deny a doctor such flexibility by requiring, without exception and under penalty of fine or imprisonment, that he or she always provide the information leading to informed consent and always perform the abortion after having personally obtained such consent.

In *Planned Parenthood of Central Missouri v. Danforth*, the Court expressed concern over informed consent requirements that operated in such a way that physicians would be shackled in the performance of their responsibilities. In upholding Missouri's minimal informed consent provision, the Court warned,

One might well wonder, offhand, just what "informed consent" of a patient is .... [W]e are content to accept, as the meaning, the giving of information to the patient as to just what would be done and as to its consequences. To ascribe more meaning than this might well confine the attending physician in an undesired and uncomfortable straitjacket in the practice of his profession. 428 U.S. at 67 n.8, 96 S.Ct. at 2840 n.8.

The testimony in this case indicates that the "same physician" requirement will create the kind of "straitjacket" the Supreme Court found undesirable.

A primary component of the cost of an abortion is the cost of the doctor's time. One way to cut some of the costs of surgery is to restrict the use of doctor-time to those services that *only* the doctor can provide. In this way, a hospital or other medical facility can make the highest and best use of a doctor's time and, concomitantly, reduce the cost of the peripheral services that make up the total package. For example, the WMC and PPRI clinics keep the costs of abortions down by attempting to utilize doctor-time only for the actual surgery. The counselling and informing functions are performed by other professionals whose time is not as expensive as a doctor's. By not "under-employing" doctors, these clinics provide an abortion at its optimal cost. The clinics practice helps alleviate the shortage of doctors available for abortion services discussed above. By utilizing a doctor's time in the most efficient fashion, the clinics free their doctors to do more of the things that only they are capable of doing. The State's "same physician" requirement will disrupt this method of proceeding, thereby increasing the cost of abortions and aggravating the increasing doctor shortage.

In addition, the "same physician" requirement will disrupt the normal practice of medicine that allows doctors to substitute for each other in certain situations. Because it contains no exceptions, the State's requirement will necessitate that, even in emergency situations, an operation be postponed if the same doctor who obtained informed consent cannot perform the operation. Thus, the requirement will also tend, in some cases, to increase the time lag between consent and operation enough that an increase in the risk associated with the procedure will result. For this and the above reasons, I must conclude that Rhode Island's "same physician" requirement imposes a legally significant burden on a woman's fundamental right to terminate her pregnancy.

In justification of the provision, the State contends that good medical practice requires physicians themselves to provide the information leading to informed consent. The State also contends that a patient's ability to reschedule her appointment if the same doctor cannot perform the surgery vitiates any problem created by the fact that the statute provides no exceptions. These arguments certainly do not demonstrate a compelling state interest. They suggest, at best, that the "same physician" requirement is a good idea.

But even the State's contention that good medical practice demands such a requirement is open to serious question on its merits. Much of the testimony at trial indicates that the national trend is toward the use of trained and supervised "paraprofessionals" to deliver the information and counselling that leads to informed consent for any surgical procedure. This trend has developed in response to a national desire to lower the cost of medical care and to offset a national shortage of doctors, and in recognition of the fact that doctors often are not the best people to perform this function. Several doctors who testified in this case indicated that they felt that a trained counsellor could be much more effective in obtaining truly informed consent than could the attending physician. This is particularly true in the area of abortions where counselling skills may be as important to the success of the procedure as is surgical technique. Counsellors may also be better at searching out ambivalence or anxiety than would a physician. Hence, even assuming that the State has a compelling interest in assuring that informed consent conforms to

good medical practice, the State has not demonstrated that the "same physician" requirement serves this end at all. The requirement limits a physician's flexibility in practicing medicine and, thus, burdens a woman's fundamental right to an abortion. Because the State has not met its burden of establishing a compelling interest and showing that the "same physician" provision is necessary to serve that interest, this requirement must be eliminated from the statute.

*Required Disclosure*

■ Section 1 requires that a "copy of the [patient's pregnancy] test be made available to her." This appears to require that a laboratory test be performed in every case to determine pregnancy. *Accord Charles v. Carey, supra,* at 786. Such a requirement is not medically necessary and may cause additional expense to a woman seeking an abortion. Pregnancy can be, and sometimes is, confirmed by methods which are less expensive than blood or urine tests. For example, the testimony revealed that it is perfectly proper and consistent with good medical practice to confirm a woman's pregnancy on the basis of the presence of a fetal heartbeat.

It could be argued that a doctor who confirms pregnancy by using such a method could still comply with the statute by making available a copy of his report to the patient. In this sense it may be argued that the section merely requires information that has probative value to a woman's decision and that the prejudicial effect is minimal. *See Planned Parenthood League of Mass. v. Bellotti, supra,* at 1016–22. As such, the section would not interfere with the exercise of a woman's fundamental right and, thus, would not violate the due process clause of the Constitution. However, this argument ignores the criminal nature of the statute. Doctors would understandably be reluctant to follow alternative acceptable practices for fear of running afoul of the law. As a result, only laboratory tests would probably be performed, which in turn would result in additional and unnecessary expense to the patient. This is an unwarranted intrusion into the physician-patient relationship and is without medical foundation. I also conclude that, from a reading of this section, a doctor could not "reasonably understand" what is proscribed. It seems to me that it is unconstitutionally vague and violative of due process, and I so find.

The next provision under "Required disclosures," § 23–4.7–2(2), provides that a woman seeking an abortion acknowledge that "the nature of an abortion has been fully explained, including the probable gestational age of the fetus at the time the abortion is to be performed." Regarding the first part of this provision, requiring that the nature of an abortion be fully explained, I interpret this to require an explanation of the *medical* nature of an abortion. Consistent with the notion that the State may act in unintrusive ways to enhance the quality—medically speaking—of the decision-making process, this provision requires simply that a woman be informed that an abortion will terminate her pregnancy and that, once completed, the operation cannot be reversed. Nothing on its face indicates that a physician must engage in a philosophical or moral discussion of abortion to satisfy this provision. In fact, physicians are not necessarily qualified to engage in such discussions and the State's interest in assuring informed consent extends only far enough to include the medical aspects of a woman's decision. Interpreted in this way, the provision requires nothing more than what was approved by the Supreme Court in *Danforth*: "we are content to accept, as the meaning [of informed consent], the giving of information to the patient as to just what would be done...." 428 U.S. at 67 n.8, 96 S.Ct. at 2840 n.8. Fundamental to a meaningful decision on whether to have an abortion is a precise understanding that it will terminate pregnancy, and that the operation is irreversible. This kind of information serves to enhance the quality of the decision-making process and cannot be viewed as anything except a neutral, non-normative requirement that a woman know exactly what it is that she is requesting. Thus, I find the

requirement that women be informed of the "nature of an abortion" to be constitutional.

The requirement that a woman know the "probable gestational age of the fetus at the time the abortion is to be performed" can also be easily upheld. It should be noted that this is not a requirement that the physician discuss the anatomical and physical characteristics of the fetus at the time the abortion is to be performed. *See Planned Parenthood League of Mass. v. Bellotti, supra,* at 1021; *Charles v. Carey, supra,* at 784; *Leigh v. Olsen,* 497 F.Supp. 1340, 1345 (D.N.D.1980). It appears to be undisputed that this information is currently supplied on a routine basis to women seeking abortions by their doctors or by the staff of the facility at which they seek an abortion. In fact, the gestational age of the fetus forms a key ingredient in the medical decision as to when to perform an abortion, when to utilize various surgical techniques, and when the "trimesters" begin and end. The gestational age of the fetus also has a direct relationship to the degree of risk associated with an abortion. *See* Center for Disease Control, *Abortion Surveillance* 48, Table 20 (1980). All of these factors indicate that this information comprises a fundamental requisite of truly informed consent.

Like information regarding the medical nature of an abortion, the probative value of information about the gestational age of the fetus when the abortion is to be performed cannot be questioned—at least on the record before me. Furthermore, any prejudicial effect resulting from these kinds of informational requirements stems from the essence of informed consent itself. The Supreme Court has held that a State may properly require that a woman be informed of what will be done to her and of its potential consequences. Hence, the State may decree that a woman not be unreasonably ignorant of the nature of her decision. Requiring that a woman be informed of the medical nature of an abortion and of the gestational age of the fetus when the abortion will be performed simply provides the woman with the necessary information on which truly informed consent must be pred-

icated. These requirements do not infringe on a woman's fundamental right to choose to terminate her pregnancy.

*Informed Consent*

■ Sections 23–4.7–2(3) and (5) require that a woman seeking an abortion acknowledge being given an explanation of the procedure to be used and of *all* medical risks, both physical and psychological, associated with the procedure, *consistent with good medical practice.* The statute also requires that she be informed of all medical risks, both physical and psychological, to herself and the fetus, associated with carrying the fetus to term, *consistent with good medical practice.*

The controversy centers around the phrase "consistent with good medical practice" as it relates to the mandated disclosure of "*all* medical risks, both physical and psychological." The defendants contend that this merely means that the doctor must discuss with the patient those risks dictated by good medical practice. However, the plaintiffs argue that the required disclosure is non-restrictive and indicates the legislature has determined that in abortion cases it is consistent with good medical practice to require that *all* medical risks be discussed. Any attempt to glean the legislative intent from legislative history will be to no avail; the Rhode Island legislature produces no committee reports and keeps no records of floor debates. Regarding the general purpose of these particular provisions, the legislature has provided only one clue in the introductory paragraph of § 23–4.7–2. There, the legislature stated that the "Required disclosure" section was enacted "[i]n order to insure that the consent of the pregnant woman is truly informed consent." This statement of purpose, however, provides almost no help in determining whether plaintiffs or defendants are correct in their views of the requirements because "truly informed consent" is consistent with the interpretations of both sides.

The First Circuit faced a similar ambiguity in the statute challenged in *Planned Par-*

*enthood League of Massachusetts v. Bellotti.* That statute required a woman seeking an abortion to sign a consent form that disclosed "the possible complications associated with the use of the procedure and with the performance of the abortion itself." *Id.* at 1020. Plaintiffs objected that this requirement called for the disclosure of *all* possible complications, however remote or improbable, and that such disclosure was both contrary to good medical judgment and likely to increase the chance of harm to a patient and the risk of irrational decision-making. *Id.* at 1020 n. 21. The First Circuit had the advantage of having before it the actual consent form which the Massachusetts Department of Public Health proposed to use under the statute. The court treated the proposed form as an authoritative interpretation of the Act, *id.* at 1008–09, and was convinced by a reading of the form that it did not provide disclosure of all possible complications. *Id.* at 1020 n.21. The court therefore found this section of the statute constitutionally unobjectionable.

Rhode Island, by contrast, has no similar authoritative construction of its statute. Absent such a construction, and given the fact that this is a criminal statute, I can only conclude that doctors will be forced to disclose *all* possible complications of both abortion and pregnancy in order to avoid the possibility of criminal liability. I therefore accept plaintiff's interpretation of the statute as representing the better view of what the statute actually requires.

For several reasons, these sections of the statute must be declared unconstitutional. As I have already stated, the United States Supreme Court in *Danforth* has ruled that, although the state may require informed written consent, it may not impermissibly burden the privacy of the physician-patient relationship or attempt to influence the choice. *See also Planned Parenthood League of Massachusetts v. Bellotti, supra,* at 1017. The pivotal inquiry is whether the state is unjustifiably interfering. An examination of the statute in light of the relevant precedents convinces me that the state is doing just that.

In *Akron Center for Reproductive Health, Inc. v. City of Akron,* the Court struck down a requirement that the physician provide each patient seeking an abortion with a detailed list of information specified in the statute. It stated:

The requirements of section 1870.06(B) impose "restrictions or regulations governing the medical judgment of the pregnant woman's attending physician with respect to the termination of her pregnancy." *Danforth,* 428 U.S. at 80, 96 S.Ct. at 2846. Such restrictions or regulations are not permitted during the first trimester of pregnancy. The district court correctly held section 1870.06(B) invalid, not because it would burden the physician, but because its effect would be to encumber the exercise of the patient's constitutionally protected right "by placing obstacles in the path of the doctor upon whom she was entitled to rely for advice in connection with her decision." *Whalen v. Roe,* 429 U.S. 589, 604 n.33, 97 S.Ct. 869, 879 n.33, 51 L.Ed.2d 64 (1977). *Id.* at 1207.

I feel that the Rhode Island statute is similarly defective. The informed consent requirements have been firmly established in Rhode Island in *Wilkinson v. Vessey,* 110 R.I. 606, 295 A.2d 676 (1972). And the State has offered no medical justification for a higher standard in abortion cases. Assuming that the *Wilkinson* standard comports with *Danforth,* I find that it is the outer limit of tolerable state interference in the physician-patient relationship in the first trimester.

In *Wilkinson* the Court stated at 295 A.2d 689:

Having established defendants' duty to disclose, we will now delineate the extent of the disclosure which should be made. Obviously there is no need to disclose risks that are likely to be known by the average patient or that are in fact known to the patient usually because of a past experience with the procedure in question. *Fleishman v. Richardson-Merrell, Inc.,* 94 N.J.Super. 90, 226 A.2d 843 (1967); *Starnes v. Taylor,* 272 N.C. 386,

158 S.E.2d 339 (1968). It is not necessary that a physician tell the patient any and all of the possible risks and dangers of a proposed procedure. *Getchell v. Mansfield* [260] Or. [174], 489 P.2d 953 (1971). As we noted earlier, materiality is to be the guide. It is our belief that, in due deference to the patient's right to self determination, a physician is bound to disclose all the known material risks peculiar to the proposed procedure. Materiality may be said to be the significance a reasonable person, in what the physician knows or should know is his patient's position, would attach to the disclosed risk or risks in deciding whether to submit or not to submit to surgery or treatment. Waltz and Scheuneman, *Informed Consent to Therapy*, 64 Nw.U.L.Rev. 628, 640 (1970). Among the factors which point to the dangerousness of a medical technique are the severity of the risk and the likelihood of its occurrence. A very small chance of death or serious disablement may well be significant; a potential disability which dramatically outweighs the potential benefit of therapy or the detriments of the existing malady may require appropriate discussions with the patient. *Canterbury v. Spence* [464 F.2d 772 (D.C.Cir.1972)], *supra.* A physician's liability in this area is to be judged on the basis of what he told the patient before treatment began. Liability should be imposed only if the trier of fact finds the physician's communication to be unreasonably inadequate. *Canterbury v. Spence, supra.* The imposition of a duty of making disclosure is tempered by the recognition that there may be a situation where a disclosure should not be made because it would unduly agitate or undermine an unstable patient. *Stauffer v. Karabin,* Colo.App. [30 Colo.App. 357], 492 P.2d 862 (1971); *DiFilippo v. Preston* [3 Storey 539], 53 Del. 539, 173 A.2d 333 (1961); *Natanson v. Kline* [186 Kan. 393, 350 P.2d 1093], *supra.*

(footnotes omitted)

This standard mandates less disclosure than is required by the Act. Medical testimony established that there is no justification for a more severe standard in abortion cases, and that requiring disclosure of all medical risks would constitute a substantial interference in the doctor-patient relationship. In short, this record is clear, as plaintiffs contend, "that there is no medical justification for treating abortions differently from other surgical procedures, and that the standard for informed consent for abortions should be the same as for other surgical procedures."

Though what has been said to this point is sufficient to strike down sections 2(3) and 2(5), their invalidity may be established for other reasons as well. The need for consent must, of course, be obviated "by an emergency which places the patient in immediate danger and makes it impractical to secure such consent." *Dunham v. Wright,* 423 F.2d 940, 941 & n.1 (3rd Cir. 1970). Yet, the Rhode Island statute, though recognizing such need in section 1 as an exception to the mandatory waiting period, totally ignores, in spite of the criminal nature of the statute, the need for a similar exception in the section under discussion. The potential for such medical emergencies are real. Furthermore, uncontradicted medical testimony established that under such circumstances a risk discussion with the patient is contra-indicated or impossible. To say the least, it is rather difficult to understand why this statute imposes criminal penalties for noncompliance in emergency situations. It hardly furthers the State's interest in maternal health and impermissibly intrudes on the physician-patient relationship. It is not narrowly drawn to further any legitimate state interest and, for this reason, sections 2(3) and 2(5) must be declared unconstitutional.

*Availability of Printed Materials*

R.I.G.L. § 23–4.7–2(4) mandates that a woman seeking an abortion be informed of the availability of certain printed information which must be published by the Rhode Island Department of Health. The physician is required to inform his patient, in substance, that the Department of Health has prepared: (a)"[m]aterials designed to inform concerned persons of pub-

lic and private agencies and services available to assist a woman through pregnancy, upon childbirth and while the child is dependent, including a comprehensive list of the agencies available and a description of the manner in which they might be contacted; " and (b) "[m]aterials designed to inform concerned persons of the probable anatomical and physiological characteristics of the fetus at the various gestational ages at which abortion might be performed, including any relevant information on the possibility of fetal survival." The doctor must also explain that this information is available to the patient.

The precise question is whether this provision contravenes the constitutional privacy interest that exists when a woman is trying to decide whether to terminate her pregnancy. In reviewing the consent form prescribed by Massachusetts law, the *Bellotti* court subdivided the fundamental privacy right extended to the abortion decision into two components:

> We approach the use of such forms in terms of the familiar balancing of burdens imposed and interests served, and begin with the fact that the right implicated by this requirement is the fundamental privacy right extended to the abortion decision by *Roe v. Wade, supra.* But assessing the peculiar nature of the burdens potentially imposed by this provision requires further subdividing that right into what we believe to be two components. One prong of the right protects the process of the decision, guarding against intrusion into the physician-patient relationship essential to the course of decisionmaking; the second prong protects the outcome of the decision, providing a shield against state requirements that attempt to skew the choice one way or another. *Id.* at 1017.

Considering first the second prong, it may be argued that the Rhode Island requirement that an abortion patient be made aware of the existence of the information does not "skew" a woman's decision because such a skewing effect can only be produced

by the nature of the information provided if she chooses to make use of such materials. Merely being made aware of their existence and availability arguably lacks such impact. This conclusion would accord with *Bellotti*'s finding that "an undue burden on the outcome of decisions can result only from the content of a particular form." *Id.* I see it differently. The disclosure required to be made is not unlike that in *Bellotti*, which was preliminarily enjoined by the Court.

In *Bellotti*, the disclosure included a description of fetal characteristics and the woman was required to sign the form at least 24 hours prior to the abortion. She did not have to obtain it from her physician, sign it or read it in his presence, and the physician could comment negatively on the content of the form. In spite of its observation that "the particular fetal description before us is a relatively brief and dispassionate one, and thus not as blatantly offensive as those held unconstitutional by other courts," the First Circuit enjoined the inclusion of the fetal description in the consent form. It noted:

> [T]he information is not directly material to any medically relevant fact, . . . that requiring women seeking abortions to read this information would cause many of them emotional distress, anxiety, guilt, and in some cases increased physical pain, . . . that most women would not want to hear such a description just prior to having an abortion and that most physicians would not consider it good medical practice to provide one, further demonstrating that the information serves as an enforced, unwelcome, and medically contraindicated state lecture. *Id.* at 1021–1022 (footnotes omitted).

In Rhode Island, the statute requires that the materials describe the fetal characteristics at the various gestational ages at which an abortion may be performed. This is totally inappropriate. It is an attempt by the state to coerce a woman's decision, without regard to her physical and mental health, by the use of information irrelevant

to her decision.[6] It is an extravagant tactic by the state that unduly burdens a woman's fundamental right to a free objective choice. *See Planned Parenthood Association v. Ashcroft*, 483 F.Supp. 679, 698–99 (W.D.Mo.1980), *aff'd in relevant part*, 655 F.2d 848, 868 (8th Cir. 1981); *Leigh v. Olson*, 497 F.Supp. 1340, 1345 (D.N.D.1980); *Akron Center for Reproductive Health v. City of Akron*, 479 F.Supp. 1172, 1203 (N.D. Ohio 1979), *aff'd in relevant part*, 651 F.2d 1198, 1206–07 (6th Cir. 1981).

It is true that the mere availability of the information may have no skewing effect if the woman does not seek out the available information, but I cannot read the second component of the privacy right independently of the first. Here, affirmative action is required by the doctor; he must advise his patient that the information is available from the Department of Health.[7] This is unlike the Massachusetts provision, under which the physician had no obligation to do anything. To say that the mandate of the Rhode Island statute merely insures that the patient knows such material is available is delusory. At a minimum, the doctor will have to relate what the materials are, who publishes them, and where they may be obtained. In many cases, depending on the curiosity of the patient at being informed of the existence of these state materials, a doctor may feel compelled to give an evaluation. Indeed, a woman patient may well decide whether or not to peruse the State's publications based on the evaluation she receives from her attending physician. The physician cannot play a passive role in this administering requirement. Such passivity might well be perceived as inconsistent with the doctor's role of medical adviser to the patient.

I conclude that the Rhode Island statute interferes with both components of the privacy right. The affirmative action by the doctor realistically risks sufficient disclosure of the content of the materials as to "skew" the woman's choice one way or the other. It also invades the process of the decision by intruding into the physician-patient relationship and creating precisely the "straightjacket" that must be avoided. In short, the state is utilizing the doctor-patient relationship as a springboard to advance its own views without a compelling reason for doing so. For this reason, subsection 4 of section 2 of the Act is unconstitutional.

*The Consent Form*

■ There is little wrong with the consent form; it does not infringe on a woman's fundamental right to an abortion. If a state can require that women seeking abortions give their informed consent, surely it can require that such consent be in writing. The requirement that a copy of the form be available to the patient is similarly unintrusive. This requirement seems fundamental to effective informed consent and to insuring that a woman know precisely what she has chosen to do. The Supreme Court made it clear in *Danforth* that a state may take minimal and unintrusive steps to assure a woman's informed consent to an abortion.

*Conclusion*

I conclude that the Act must be stricken in its entirety except for § 23–4.7–4, which requires the department of health to publish certain information, and § 23–4.7–3.1, which will be the subject of a separate hearing.

An order will be prepared accordingly.

---

**6.** The information provided by the Rhode Island statute may be particularly irrelevant because it discloses fetal characteristics at various gestational ages. Thus, a woman who is eight weeks pregnant may be informed of the physiological characteristics of an 18 week fetus. The First Circuit has recognized that such a disclosure would be "clearly irrelevant and potentially misleading." *Bellotti* at 1022 n.27.

**7.** Subsection 4 disclosures require the physician to inform the patient that the printed information is available, if it has been made available by the Department of Health. Under section 4 of the Act, the Department of Health is required to publish the material within 60 days of the enactment of the Act.