NATIONAL EDUCATION ASSOCIATION OF RHODE ISLAND, et al.,

v.

J. Joseph GARRAHY, et al.

PLANNED PARENTHOOD OF RHODE ISLAND, et al.,

v.

Thomas J. CALDARONE, Jr., et al.

Civ. A. Nos. 82–0399P, 83–0406P.

United States District Court, D. Rhode Island.

Dec. 3, 1984.

Lynette Labinger, Providence, R.I., for plaintiffs.

Donald Elbert, R.I. Atty. General's Dept., Providence, R.I., Albert West, Providence, R.I., for defendants in No. 82–0399P.

Donald Elbert, R.I. Atty. General's Dept., Providence, R.I., for defendants in No. 83–0406P.

## OPINION

PETTINE, Senior District Judge.

Plaintiffs in this consolidated action seek permanent declaratory and injunctive relief, pursuant to 42 U.S.C. § 1983, against the enforcement of two statutes enacted by the Rhode Island General Assembly which regulate the availability of health insurance coverage for abortions. The first statute, Rhode Island General Laws § 27–18–28 ("the health insurers' prohibition"),[1] re-

---

1. R.I.G.L. § 27–18–28 provides:

*Health Insurance Contracts—Abortion.*—No health insurance contract, plan or policies here and after delivered or issued for delivery in the state shall provide coverage for induced abortions (except where the life of the mother would be endangered if the fetus were carried to term or where the pregnancy resulted from rape or incest) except by an optional rider for

which there must be paid an additional premium. This section shall be applicable to all contracts, plans or policies of:
(a) All health insurers subject to this title; and
(b) All group and blanket health insurers subject to this title; and
(c) All non-profit hospital, medical, surgical, dental and health service corporations; and

quires all insurers doing business in Rhode Island to exclude from comprehensive health insurance policies coverage for all induced abortions, except those where the life of the mother would be endangered if the fetus were carried to term or where the pregnancy is the result of rape or incest. Coverage for the abortions excluded by the statute may be obtained only by a separate, optional rider for which an additional premium must be paid. The second statute, R.I.G.L. § 36–12–2.1,[2] prohibits the State of Rhode Island and its municipalities from providing public employees with health insurance covering the same class of excluded abortions. Plaintiffs challenge this statute only insofar as it applies to municipal employers ("the municipal prohibition"). Plaintiffs challenge the health insurers' prohibition as violative of the Supremacy Clause insofar as it is inconsistent with Title VII, as an impermissible burden on the right of a woman, in consultation with her doctor, to choose to terminate her pregnancy, as that right is protected by the First, Fourth, Ninth and Fourteenth

Amendments to the United States Constitution, and as a violation of the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs challenge the municipal prohibition as violative of Title VII of the Civil Rights Act of 1964, and as an impermissible burden on the protected right of abortion.

A temporary restraining order having been issued against the enforcement of both statutes, the matter is now before the Court on cross-motions for summary judgment, in support of which the parties have filed stipulations of fact. Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331, 1343(3), 2201, 2202, and 42 U.S.C. § 2000e–5(f).

## I. PARTIES

Plaintiffs challenging the health insurers' prohibition are Planned Parenthood of Rhode Island ("PPRI"), a class of physicians and a class of individual women. PPRI is a licensed facility in Providence

---

(d) All health maintenance organizations; and

(e) Any provision of medical, hospital, surgical and funeral benefits and of coverage against accidental death or injury when such benefits or coverage are incidental to or part of other insurance authorized by the statutes of this state.

Nothing contained herein shall be construed to pertain to insurance coverage for complications as the result of an abortion.

2. R.I.G.L. § 36–12–2.1 provides:

*Health Insurance benefits—Coverage for abortions excluded.*—The State of Rhode Island or any city or town shall not include in any health insurance contracts, plans or policies covering employees any provision which shall provide coverage for induced abortions (except where the life of the mother would be endangered if the fetus were carried to term, or where the pregnancy resulted from rape or incest). This section shall be applicable to all contracts, plans or policies of:

(a) All health insurers subject to title 27; and

(b) All group and blanket health insurers subject to title 27; and

(c) All non-profit hospital, medical, surgical, dental and health service corporations; and

(d) All health maintenance organizations; and

(e) Any provision of medical, hospital, surgical and funeral benefits and of coverage against accidental death or injury, when such benefits or coverage are incidental to or part of other insurance authorized by the statutes of this state.

Provided, However, That the provisions of this section shall not apply to benefits provided under existing collective bargaining agreements entered into prior to [June 30, 1982].

Nothing contained herein shall be construed to pertain to insurance coverage for complications as the result of an abortion. As originally enacted, the statute barred insurance coverage for induced abortions "except those necessary to prevent the death of the mother" or in cases of rape or incest. Plaintiffs' original complaint, filed before the statute was amended, sought injunctive relief against the statute in its entirety and the original temporary restraining order issued by this Court so enjoined the statute. After the provision was amended in 1983, plaintiffs dropped their claim against the statute's prohibition of abortion coverage for state employees and the Court's restraining order was amended appropriately. The parties agreed at that time that the orders restraining enforcement of both the municipal prohibition and the health insurers' prohibition would remain in effect until further order of the Court.

which provides abortion services. The class of individuals consists of all women of childbearing age in the state who have or will have comprehensive health insurance covering the cost of abortions, including the excluded abortions. The class of physicians consists of all licensed physicians who perform or wish to perform abortions in the state for women whose health insurance covers the cost of abortion. The defendant is the State Commissioner of Insurance, who would be required by law to enforce the prohibition.

Plaintiffs challenging the municipal prohibition are the Rhode Island Federation of Teachers ("RIFT"), the Rhode Island Chapter of the National Education Association ("NEA") and a class of individual women. Both RIFT and NEA are labor organizations whose members include women of childbearing age and capacity who are employed by municipal subdivisions of Rhode Island. The class of individual women consists of all women of childbearing age and

capacity who have been, are now, or will be employed by any municipal or other subdivision of Rhode Island. The class is represented by plaintiffs Krause and Doe, each of whom is of childbearing age and capacity, does not presently wish to bear children and would consider abortion if she became pregnant. Defendants are the State Commissioner of Insurance, who would be required by law to enforce the prohibition, and most of the school committees in Rhode Island. By agreement of the parties, the Lincoln School Committee shall serve as the sole active municipal defendant; the remainder of the school committees have agreed to be bound by any judgment rendered against Lincoln.[3]

## II. BACKGROUND

### A. *The Health Insurers' Prohibition*

At issue here is whether, consistent with the Pregnancy Discrimination Act of Title VII [4] and the constitutional protection af-

---

**3.** Lincoln, in its memorandum, moves this Court to dismiss it and the other school committees as improper parties defendant. Arguing that municipal employers must follow the dictates of state law, Lincoln asserts that liability for any infirmity in the abortion benefits prohibition may not properly be entered against the municipalities. Plaintiffs respond that the municipalities are named as defendants only with respect to the Title VII claim, and that the constitutional challenge is directed solely against the Insurance Commissioner.

I conclude that the school committees are proper defendants in the Title VII claim and therefore deny Lincoln's motion to be dismissed. "(T)he scheme of Title VII provides that employers are exempted from liability under state laws which require the doing of acts which constitute unlawful employment practices ... not that reliance on state statutes resulting in discriminatory practices bars Title VII liability ..." *Williams v. General Foods Corp.*, 492 F.2d 399, 404 (7th Cir.1974) (citations omitted); *see* 42 U.S.C. § 2000e–7. Accordingly, employers who engage in discriminatory practices pursuant to state statute may be held liable under Title VII. *Id.; Rosenfeld v. Southern Pacific Co.*, 444 F.2d 1219 (9th Cir.1971). If the state provision upon which an employer relies is held to violate Title VII, it will be deemed superseded by federal law. *See* 42 U.S.C. § 2000h–4. Thus, if plaintiffs here successfully demonstrate that the school committees will deny or have denied them abortion benefits pursuant to a Rhode Island law which violates Title VII, the school

committees may be properly enjoined from continuing that practice, and the statute will be superseded by Title VII. Further, where, as here, the state is also a defendant and has assumed, pursuant to the parties' agreement, principal responsibility in defending the validity of the statute, no inequity will result from compelling the municipal employers to remain as defendants.

**4.** The Pregnancy Discrimination Act of Title VII, 42 U.S.C. § 2000e(k) provides:

(k) The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e–2(h) of this title shall be interpreted to permit otherwise. This subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion: *Provided,* That nothing herein shall preclude an employer from providing abortion benefits or otherwise affect bargaining agreements in regard to abortion.

forded a woman's right to choose abortion, the state may properly compel all insurers in Rhode Island, including private insurers, to effectively impose a surcharge on insurance coverage for the excluded abortions.

The relevant facts are undisputed and may be briefly summarized. Before the planned effective date of the prohibition, virtually all comprehensive health insurance policies in Rhode Island which covered pregnancy-related conditions also covered all induced abortions. Stipulation of the Parties ("Stip.") II, ¶ 8. Blue Cross and Blue Shield of Rhode Island ("Blue Cross") and the Rhode Island Group Health Association ("RIGHA"), who between them provide the vast majority of health insurance policies in Rhode Island, Stip. II, ¶ 8b, have stated that but for the prohibition, they would not have deleted or segregated from their comprehensive policies the abortion coverage at issue here. Stip. II, ¶ 9. The insurers have also stated that the abortions excluded by the statute represent the majority of all abortions performed in Rhode Island. Stip. II, ¶ 11a. Before the Court entered its restraining order, Blue Cross and RIGHA had formulated their responses to the restrictions imposed by the General Assembly. Stip. II, ¶ 15. Under the plans which the insurers intended to submit for approval to the Commissioner, the monthly cost of comprehensive coverage would be reduced for consumers who do not seek coverage for the excluded abortions. Those wishing the "abortion rider" would be required to pay an extra premium, calculated by the insurers to represent the incremental cost of abortion coverage.[5] The effect of this implementing plan would be to render comprehensive insurance, including abortion coverage, available at the rates which prevailed prior to the statutory restriction—but nonetheless at a price higher than the one charged for a policy without abortion coverage.

The implementing plan, however, would not make abortion coverage available to all who wished to purchase it, even at a higher price. For those women insured through employer-financed group plans, the decision whether to purchase the rider would be left solely to the employer. *Id.* Similarly, for women insured through a non-employer group plan, one hundred percent of the group's members would be required to select the rider in order for the policy to include it. *Id.* Accordingly, any employer or any single group member could veto the rider for all the women insured under such plans. Women wishing to retain abortion coverage would then be required to leave the group plan—which could mean losing an employer-subsidy or group discount.[6] Furthermore, Blue Cross would make available abortion and maternity coverage only under a family plan. Stip. II, ¶ 15b. Hence, a single woman seeking to maintain coverage for abortions could not do so with Blue Cross at any price. Stip. II, ¶¶ 15b, 21. Rather, she would be required to switch to RIGHA which, unlike Blue Cross, does not permit its subscribers to choose their own physicians or facilities. Thus, the transition would carry substantial adverse consequences for at least some Blue Cross subscribers.

The plaintiffs highlight the fact that insurance coverage for no other medical procedure is regulated in this fashion. Stip. II, ¶ 22. Further, plaintiffs allege and defendants concede that loss of insurance coverage for the excluded abortions may delay or deter some employees from having abortions which they desire, Stip. II, ¶¶ 23–26, and that such medically unnecessary delay in securing an abortion may operate to the detriment of women's health. *Id.* at ¶ 27. Plaintiffs submit the uncontroverted affidavit of Dr. Lynn Lowe in further support of these medical claims.

---

**5.** Under the plan proposed by Blue Cross, the cost of comprehensive health insurance purchased without the abortion rider would be reduced by 56 cents per month for family memberships and by 41 cents per month for individuals. RIGHA proposed reductions of 14 cents per month for family memberships and 6 cents per month for individuals. Stip. II, ¶ 15(a)–(b).

**6.** For plaintiffs Cooley and Colt, the annual loss would be between $1846.08–$2024.04, respectively. Stip. II, ¶¶ 19–20.

Defendants stipulate to all the facts marshalled by plaintiffs in opposition to the health insurers' prohibition. They assert that the Legislature has merely expressed a policy preference for childbirth over abortion—a preference which defendants claim is shielded from constitutional scrutiny by the Supreme Court's decisions in *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977) and *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). In those cases, the Court held that state governments and the federal government, respectively, may encourage childbirth over abortion by declining to subsidize abortions with government funds.

### B. *The Municipal Prohibition*

At issue here is whether the state has run afoul of either Title VII or the federal Constitution by barring all municipal employers in Rhode Island from providing employees with health benefits covering the excluded abortions.

The relevant facts are again undisputed. Prior to the enactment of the municipal prohibition, the Lincoln School Committee provided its employees, as part of their fringe benefits, with health insurance that covered the cost of any induced abortion. Stip. III, ¶ 13. The policies were provided by either Blue Cross or RIGHA. Stip. III, ¶ 13e. Prior to the state legislation, Lincoln had made no determination to eliminate coverage for the excluded abortions, Stip. III, ¶ 13f, although it has not objected to the state's determination. Since enactment of the statute, at least Blue Cross, and possibly RIGHA, have notified all public employers, including Lincoln, that pursuant to the statute, coverage for the excluded abortions would be deleted from employees' policies. Stip. III, ¶ 16–17.

Plaintiffs call particular attention to the fact that the state does not typically involve itself in the myriad employment decisions made by local government employers. Such decisions include, for example, wage, benefit, collective bargaining, hiring, firing and budget determinations. Stip. III, ¶ 22. Likewise, the state pays neither the sala-

ries nor the fringe benefits of municipal employees. Stip. III, ¶ 23. Indeed, plaintiffs allege and the defendants concede that the municipality, and not the state, is the "employer" of its employees for purposes of Title VII. *Id.* Finally, plaintiffs again underscore the negative health effects that flow from a woman's decision to delay, for inability to pay, the decision whether to have an abortion or to delay, or forego the abortion itself, if the woman wishes to terminate her pregnancy. Stip. II, ¶¶ 23–27.

For their part, defendants take no issue with the foregoing facts. Rather, they argue only that they are entitled, as a matter of federal statutory and constitutional law, to decree that no public funds in Rhode Island shall subsidize the excluded abortions—irrespective of the consequences for female public employees. They again rely on the Supreme Court's public funding decisions, which they argue recognize that the state may ensure that no public funds are spent by any governmental entity for the excluded abortions.

## III. STANDING

■ With a single exception, defendants do not contest plaintiffs' standing to challenge the statutes. The only issue defendants raise is whether the plaintiff municipal employees may properly attack the municipal prohibition as a violation of Title VII. Plaintiffs premise their Title VII claim on the theory that the Pregnancy Discrimination Act of Title VII reserves for individual employers the decision whether to offer employees abortion coverage and that the state's blanket prohibition impermissibly usurps each municipality's prerogative. Defendants argue that such a claim advances the federal statutory rights of employers and may not properly be brought by the employees. I cannot agree.

■ The constitutional dimension of the standing inquiry requires that the plaintiff allege "such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal court jurisdiction and to justify the exercise of the court's reme-

dial powers in *his* behalf." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)). The core of the Article III requirement is that the plaintiff allege real or immediately threatened injury in fact. *See e.g., Gladstone Realtors v. Bellwood*, 441 U.S. 91, 99–100, 99 S.Ct. 1601, 1607–1608, 60 L.Ed.2d 66 (1979). Plaintiffs here have plainly alleged such injury. The stipulated facts state that the cost of the excluded abortions in Rhode Island ranges from $185 to $1,000, Stip. II, ¶ 11c—a cost which any plaintiff employee would be forced to bear herself if the statute goes into effect and she seeks to have an excluded abortion.

■ Nor is there any "prudential" bar to plaintiffs' standing in this case. *See generally Ozonoff v. Berzak*, 744 F.2d 224 (1st Cir.1984) (reviewing in detail prudential standards for standing). For plaintiffs here rest their challenge on alleged injury to their own rights, not merely those of third parties. The general rule denying standing where a claimant asserts the rights of a third party, *see generally Warth v. Seldin, supra,* applies only where the claimant lacks the constitutional prerequisite of an injury-in-fact, *see, e.g., U.S. v. Raines*, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960). Where, as here, the claimant alleges a "derivative injury" as a result of the deprivation of the third party's rights, it is settled that he or she may sue. *See* L. Tribe, *American Constitutional Law*, § 3–27, at 108; *Truax v. Raich*, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915) (alien employee may challenge state criminal prohibition on hiring aliens, although employer is subjected to criminal sanctions); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (private school owners may challenge enforcement of state statute criminalizing

parents' failure to send children to public school, although parents are subjected to criminal sanctions); *see generally* Note, *Standing to Assert Constitutional Jus Tertii*, 88 Harv.L.Rev. 423, 434 (1974). The very justification for such a rule is exemplified by this case: if the party whose rights are asserted cannot or does not challenge the provision, then the derivately-injured party is left without a means of redress. *See Tribe, supra,* at 108; *Note, supra,* at 435.

## IV. THE VALIDITY OF THE RHODE ISLAND STATUTES

### A. *The Title VII Challenge*

In deference to the settled rule that a federal court, "for sound jurisprudential reasons, 'ought not to pass on questions of constitutionality unless such adjudication is unavoidable,'" *Harris v. McRae*, 448 U.S. 297, 306–07, 100 S.Ct. 2671, 2682–83, 65 L.Ed.2d 784 (1980) (quoting *Spector Motor Service v. McLaughlin*, 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944)), the Court will consider first the Title VII claims raised by plaintiffs.

■ Plaintiffs ground their Title VII claim against both of the challenged statutes in the Pregnancy Discrimination Act of 1978, ("the PDA"), 42 U.S.C. § 2000e(k). The Act requires employers who elect to provide their employees with health and disability benefits to include benefits for pregnancy-related conditions in their plans.[7] *See Barone v. Hackett*, No. 81–90P (D.R.I. May 20, 1982) (Pettine, C.J.). In the critical language at issue here, Congress excepts coverage for abortions from this general rule:

> This subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except

---

**7.** The PDA was enacted by Congress in 1978, expressly to overturn the Supreme Court's ruling in *Gilbert v. General Electric Co.*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). *Gilbert* held that employer disability plans declining to pay benefits for pregnancy and maternity-relat-

ed disabilities did not constitute sex discrimination prohibited by Title VII. *See generally Newport News Shipbuilding and Drydock Co. v. EEOC*, 462 U.S. 669, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983) (reviewing legislative history of the PDA).

where medical complications have arisen from an abortion: *Provided,* That nothing herein shall preclude an employer from providing abortion benefits or otherwise affect bargaining agreements in regard to abortion.

The question before this Court is whether the PDA reserves solely for the individual employer the decision whether to provide abortion benefits. Plaintiffs argue that the PDA does affirmatively protect the employer's right to make the coverage decision, such that (1) the health insurers' prohibition is fatally inconsistent with the PDA insofar as it will operate to induce employers to exclude the more costly abortion benefits and (2) the municipal prohibition is directly violative of Title VII insofar as it usurps from municipal employers the benefits choice.

In interpreting Title VII, the Court must look first to the language of the statute, ascribing to the words used their "ordinary meaning." *American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982). By its words, the PDA clearly confers federal statutory protection on the provision of pregnancy-related benefits and certain limited abortion benefits. Just as clearly, the words of the statute expressly decline to protect benefits for those abortions excluded by the Rhode Island statutes. Congress took care, however, to clarify that employers should not read this exclusion to amount to a federal prohibition on the provision of these abortion benefits. The critical words state that *"nothing herein,"* i.e., in Title VII, "shall preclude an employer from providing the benefits." Yet, plaintiffs would apparently read *"nothing herein"* to mean *"nothing,"* thus finding in the PDA a congressional command that no law, enacted by *any* legislative body, shall bar or operate to restrict the provision of these benefits. But, as limiting language, the word "herein" could scarcely be more clear. Thus, far from imposing an affirmative bar to state legislation affecting the provision of abortion benefits, the language of the PDA states only a position of deliberate federal statutory neutrality with respect to these benefits.

The legislative history of the Act supports the identical conclusion. The House report which accompanied the bill explained:

Many members of the committee were troubled, however, by any implication that an employer would have to *pay* for abortions not necessary to preserve the life of the mother through medical benefits or other fringe benefit programs, even if that employer—a church organization for example—harbored religious or moral objections to abortion; such a requirement, it was felt, could compromise the religious freedom of such employers. The committee, therefore, amended the language of the bill to deal with the problem, by making clear that such employers will not be required to pay for abortions except where the life of the mother would be endangered if the fetus was carried to term. At the same time, the bill as amended makes plain that there is no intent to alter the effect of any other laws, including the National Labor Relations Act, upon the question of benefits for abortion, or to forbid employers to provide such benefits if they wish to. (emphasis in original).

House Report 95–948, *reported in* 1978 *United States Code Congressional and Administrative News* 4749, 4755.

Likewise, the remarks of individual congresspersons on the floor restated this position. *See id.* at 4766; 124 Cong.Rec. 21435 (remarks of Rep. Hawkins); 124 Cong.Rec. 21437 (remarks of Rep. Beard). Indeed, the words of the Committee Report address directly the effect which Congress believed the PDA should have on other laws:

There is *no intent to alter the effect of any other laws,* including the National Labor Relations Act, *upon the question of benefits for abortion,* or to forbid employers to provide such benefits if they wish to. (emphasis supplied).

1978 *U.S.Code Cong. & Admin.News* at 4755 (emphasis added).

Presumably, the category of "any other laws" includes *state laws.* Here, Rhode Island has chosen to legislate restrictions on the provision of these benefits. While these enactments raise grave federal constitutional problems, as I discuss *infra,* I do not find that they violate federal statutory policy.

Having found that the PDA announces a federal policy of neutrality on the question whether employers must provide abortion benefits, I find no fatal inconsistency [8] in the health insurers' prohibition—even if that enactment could weight the individual employer's choice against the provision of benefits.

■ Likewise, I conclude that the PDA imposes no *federal statutory limitation* on the sovereign prerogatives of a state government [9] to restrict the benefits paid to public employees—as Rhode Island has done through the municipal prohibition. While plaintiffs are correct in arguing that the municipal employer and not the state is, for purposes of Title VII, considered the plaintiffs' "employer," *see* Stip. III, ¶ 24; *Vanguard Justice Society v. Hughes,* 471 F.Supp. 670 (D.Md.1979); *Curran v. Portland Superintendent of School Committee,* 435 F.Supp. 1063 (D.Me.1977), I hold that Title VII imposes no bar on state legislation compelling municipal employers to withhold the benefits. History teaches that when Congress has taken legislative steps to subject state and local governmental employers to the commands of federal antidiscrimination legislation, these steps have been both deliberate, *see, e.g.,* 42 U.S.C. § 2000e(a), *enacted as* Pub.L. 92–261 § 2(1) (1972) (amending Title VII to

cover state and local employers), and controversial, *see, e.g., United States v. City of Chicago,* 573 F.2d 416 (7th Cir.1978) (rejecting city's claim that Tenth Amendment prohibits finding that city government violated Title VII absent a showing of discriminatory purpose). Where, as here, Congress has unequivocally adopted a position of neutrality, and has disclaimed any intent to affect other laws on the subject, this Court cannot find the federal limitation on state legislation which plaintiffs seek. Accordingly, I hold that the municipal prohibition does not violate Title VII.

## B. *The Constitutional Challenge*

I must consider plaintiffs' constitutional challenge to the Rhode Island statutes within the analytical framework set forth by the Supreme Court in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and its progeny.

In *Roe,* the Court held that the constitutional right of privacy "is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." 410 U.S. at 153, 93 S.Ct. at 727. Recently, the Supreme Court has reaffirmed the vitality of *Roe's* basic holding, recognizing that a woman's right to choose to terminate her pregnancy is grounded in the "concept of personal liberty" guaranteed by the Constitution and traceable to the "individual's 'freedom of choice in matters of marriage and family life.'" *City of Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 103 S.Ct. 2481, 2491, 76 L.Ed.2d 687 (1983) (quoting *Roe,* 410 U.S. at 169, 93 S.Ct. at 735, Stewart, J., concurring).

---

**8.** The cases plaintiffs cite in support of their preemption argument involve state statutes which, on their face, conflict with Title VII's most fundamental objective of prohibiting discrimination against protected classes. *See, e.g., Rosenfeld v. Southern Pacific Co.,* 444 F.2d 1219, 1225–26 (9th Cir.1971) (state statute restricts physical labor which female employees may perform); *Caterpillar Tractor Co. v. Grabiec,* 317 F.Supp. 1304 (S.D.Ill.1970) (state statute restricts overtime hours which female employees may work). There is simply no federal statuto-

ry basis for finding a parallel inconsistency here.

**9.** As I discuss more fully with respect to the constitutionality of the municipal prohibition, all the parties agree that the state is empowered, under Rhode Island law, to direct its towns or cities to make or withhold payments to municipal employees, if the legislative directive applies equally to all towns and cities. No claim is made by any party that any principle of local government law, including so-called "home rule," bars such a statutory mandate.

■ In recognition of the fundamental right to choose abortion, the Court has insisted that strict scrutiny be applied to laws regulating abortion, and that such laws be justified by a "compelling state interest" and a showing that the regulation is "narrowly drawn" to protect "only the legitimate interests at stake." 410 U.S. at 155, 93 S.Ct. at 728. In turn, the Court has recognized only two such compelling state interests: the interest in protecting the health of the woman, which becomes compelling at the end of the first trimester; and the interest in protecting potential life, which becomes compelling at the point of viability. *Roe* at 162–63, 93 S.Ct. at 731–32. The Court has been careful to note, however, that a woman's right "is not unqualified and must be considered against important state interests in abortion." *Id.* at 154, 93 S.Ct. at 727. Accordingly, the state may still enact legislation affecting even the first trimester, but only if two requirements are met: the regulation imposes no non-*de minimis* burden on the woman's exercise of her right, *Women's Medical Center of Providence v. Roberts*, 530 F.Supp. 1136, 1144 (D.R.I.1982) (*citing Colautti v. Franklin*, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979)) or, as the Court in *Akron* articulated the standard, "has no significant impact on" it, 103 S.Ct. at 2492–93, *and* is justified by an "important state health objective," *id.*

■ Additionally, and at the heart of this case, the state may, without running afoul of the *Roe* right, enact "governmental spending statute[s]," *id.*, 103 S.Ct. at 2500, n. 33, which decline to commit public funds to abortion. In *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), the Court upheld Connecticut's decision to withhold Medicaid funds for medically unnecessary abortions. With the caveat that its decision "signal[led] no retreat from *Roe* or the cases applying it," 432 U.S. at 475, 97 S.Ct. at 2383, the Court reasoned that while states are not free to interpose obstacles to a woman's protected decision:

[t]he Connecticut regulation places no obstacle—absolute or otherwise—in the pregnant woman's path to an abortion. An indigent woman who desires an abortion suffers no disadvantage as a consequence of Connecticut's decision to fund childbirth; she continues as before to be dependent on private sources for the service she desires. The state may have made childbirth a more attractive alternative, thereby influencing a woman's decision, but it has imposed no restriction on access to abortions that was not already there.

*Id.* at 474, 97 S.Ct. at 2382–83.

The same reasoning was applied four years later in *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), where the Court extended *Maher* to hold that the federal government may withhold Medicaid funds for even medically necessary abortions.

1. *The Health Insurers' Prohibition*

■ The plaintiffs argue that the health insurers' prohibition unconstitutionally burdens the right of abortion by interfering with a woman's ability to insure against the risk of abortion, which in turn adds cost and delay to the procedure. Defendants argue that the statute represents a policy choice to encourage childbirth over abortion—a choice they claim is protected by *Maher* and *Harris*. Defendants liken private insurance payments to public funds in that the "consuming public" essentially funds all insurance through "risk spreading." Def. Memo, 5, 7, n. 7. Plaintiffs counter that the public funding decisions are inapposite to a state-imposed restriction on "the ability of private persons and groups to enter into private insurance contracts with private insurance companies." Pl. Reply Memo, 4. Whether the health insurers' prohibition is constitutional must, accordingly, turn on the meaning which may fairly be given *Maher* and *Harris*.[10]

---

10. The Court's decisions in *Maher* and *Harris* have been the subject of vigorous debate. Numerous commentators have questioned the soundness of the holdings. *See, e.g.,* Kreimer, *Allocational Sanctions: The Problem of Negative Rights in a Positive State,* 132 P.Pa.L.Rev. 1293

The core principle animating the funding cases is the distinction drawn by the Court between affirmative government action in burdening the exercise of the abortion right, and government inaction in declining to remove existing burdens on the right. In articulating this principle, the *Harris* court explained:

> although government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those not of its own creation. Indigency falls in the latter category. The financial constraints that restrict an indigent woman's ability to enjoy the full range of constitutionally protected freedom of choice are the product not of governmental restrictions on access to abortions, but rather of her indigency....

448 U.S. 297, 316, 100 S.Ct. 2671, 2688. Thus, while teaching that a state is not constitutionally compelled to pay to remove financial burdens it did not impose, the cases clearly gave no license to the converse, the idea that government is free to *create* financial obstacles to abortion.

Thus, viewed, the public funding cases provide the state with no refuge from constitutional scrutiny of the health insurers' prohibition. The health insurers' prohibition has, on its face, nothing to do with the question whether public funds shall subsidize abortions. Rather, the statute imposes a surcharge on women wishing *privately* to insure against the risk of abortion. The state's imposition of this surcharge on privately financed insurance is precisely the sort of affirmative "obstacle" which *Maher* and *Harris* stated the government was prohibited from creating. Indeed, in its holding, the *Maher* court relied heavily

on the fact that a woman seeking an abortion would "continue as before to be dependent on private sources" for the required funds. *Id.* Yet, here, Rhode Island purports to restrict access to the very private funds on which the woman is supposed to rely. In a recent ruling striking down a Pennsylvania statute nearly identical to the Rhode Island health insurers' prohibition, the Third Circuit recognized that such a restriction constitutes an impermissible, state-imposed obstacle to abortion:

> The state generally need not commit public funds to abortion, and may in this respect choose childbirth over abortion as a matter of policy.... Pennsylvania has gone further in favoring childbirth over abortion, and has imposed a requirement on private insurers to issue policies that do not cover abortions and that cost *less* than policies which do cover them. This requirement adds an additional barrier to a woman's access to an abortion and is unconstitutional.

*American College of Obstetricians and Gynecologists v. Thornburgh*, 737 F.2d 283, 303 (3rd Cir.1984) (citations omitted) (emphasis in original).

Like Pennsylvania, Rhode Island has attempted to translate the limited *Maher-Harris* public funding doctrine into *carte blanche* to legislate so as to discourage abortion. Were states free to legislate so broadly to discourage abortion, *Roe* would not doubt meet a swift demise. On the contrary, the *Akron* decision, in reaffirming *Roe*, rejected the defendant's premise and made plain that any statute, other than a "governmental spending statute," 103 S.Ct. at 2500, note 33, that adds cost and delay to the abortion procedure will not

---

(1984) (reviewing literature); Perry, *Why the Supreme Court was Plainly Wrong in the Hyde Amendment Case: A Brief Comment on Harris v. McRae*, 33 Stan.L.Rev. 1113 (1980); Goldstein, *A Critique of the Abortion Funding Decisions: On Private Rights in the Public Sector*, 8 Hastings Const.L.Q. 313 (1981). Indeed, every state court that has considered the Medicaid abortion funding issue under a state constitution since *Harris* has come to the opposite conclusion. *See* Kreimer, *supra*, at 1375, citing *Committee to*

*Defend Reproductive Rights v. Myers*, 29 Cal.3d 252, 625 P.2d 779, 172 Cal.Rptr. 866 (1981); *Moe v. Secretary of Admin. and Fin.*, 382 Mass. 629, 417 N.E.2d 387 (1981); *Right to Choose v. Byrne*, 91 N.J. 287, 450 A.2d 925 (1982); *Planned Parenthood Ass'n v. Dep't of Human Resources*, 63 Or.App. 41, 663 P.2d 1247 (1983); *Fischer v. Dep't of Pub. Welfare*, —— Pa.Cmwlth. ——, 482 A.2d 1137 (1984), *reh'g granted en banc, argued* May 1, 1984.

survive if it has any significant impact on the abortion right, unless justified by a compelling state interest. 103 S.Ct. at 2495, 2503 (striking down a second trimester hospitalization and 24 hour waiting period requirement as impermissibly adding cost and delay).

Applying the *Akron* analysis, I conclude that the insurers' prohibition must be subjected to strict scrutiny. Insofar as the statute applies to all three trimesters, Stip. II, ¶ 28, it must be judged by the strict standard of review applicable to the first. *Women's Medical Center of Providence v. Roberts*, 530 F.Supp. 1136, 1144 (D.R.I. 1982). Further, the restriction will burden, in that it will unquestionably have a "significant impact" on, many women's right to choose abortion. The record states, and defendants concede, that solely as a result of the enforcement of the statute, some women who wish to terminate their pregnancies will be deterred from, or at least delayed in, doing so. Defendants further concede that medically unnecessary delay is detrimental to women's health, and that deterrence due to financial inability may likewise be detrimental to women's health. The uncontroverted affidavit of plaintiff Dr. Lynn Lowe confirms and explores these facts. Defendants apparently consider these impacts irrelevant to the statute's constitutionality because the same impacts were present in the public funding cases. Because I have determined that those cases do not apply to a statute which restricts access to private funds, I must reject this argument. I hold, therefore, that the impacts stipulated by the parties are sufficiently "significant"[11] to require that the statute bear strict scrutiny. I hold further that neither of the two compelling state interests thus far recognized by the Supreme Court—the interest in maternal health after the first trimester and the interest in protecting potential human life once the fetus is viable—has been or could be adduced in support of the health insurers' prohibition. Indeed, its stated objective—to discourage abortions and encourage childbirth—is, standing alone, an impermissible state objective outside the limited government spending context. The health insurers' prohibition is, therefore, unconstitutional.[12]

### 2. *The Municipal Prohibition*

■ Plaintiffs concede that under the authority of *Maher* and *Harris*, Rhode Island may decline to use its own funds to provide its own employees with abortion benefits. They likewise concede that each municipality could *itself* decide whether to use its own funds to provide its own employees with abortion benefits. Plaintiffs argue strenuously, however, that Rhode Island has gone beyond *Maher* and *Harris* in legislatively compelling the municipali-

---

**11.** The burden imposed by the health insurers' prohibition is particularly egregious in light of the plans proposed by Blue Cross and RIGHA to implement the statute. While the supplementary premium required is relatively small, more important is the veto feature of the plan. Any employer could veto the rider for all employees covered by the employer's policy. Any single member of a non-employer group could likewise veto the rider for an entire group plan. Women seeking to retain coverage in these circumstances would be compelled to leave their group plans—at a cost of up to $2000 annually—and self-finance an entire health insurance package. If a woman elected to remain in a non-rider group plan, but had to self-finance an abortion, the cost would range from $185–$1000 in Rhode Island. Either way, the financial consequences would plainly be serious. *See Akron*, 103 S.Ct. at 2495 (added cost of $450–$500 to comply with second trimester hospitalization re-

quirement constitutes significant limit on ability to obtain abortion).

In addition to the veto feature, Blue Cross' plan would also make the rider unavailable to single women. Here, women would be put to the choice whether to leave their plan and change to RIGHA's wholly different health maintenance approach. In so choosing, a woman would lose the freedom she had under Blue Cross to select her own doctor and facility.

The plans, thus, impose numerous burdens on the exercise of the abortion right. Accordingly, although I hold the health insurers' prohibition unconstitutional on its face, I also hold that the terms of the insurers' plans render the statute unconstitutional as applied through those plans.

**12.** Because I have ruled the statute unconstitutional as a burden on the right to choose to terminate a pregnancy, I need not reach the equal protection question.

ties to withhold benefits for the excluded abortions. Defendants respond that under state law, their authority over municipalities in the area of education and in matters of statewide import is plenary, and that, therefore, plaintiffs have identified a distinction without a difference. The municipalities agree.

To the extent that defendants characterize this question as a state law issue, they are incorrect. For plaintiffs freely concede, as they must, that the Rhode Island Constitution unquestionably vests in the General Assembly the power to legislate in matters of statewide application, R.I. Constitution, Art. IV, §§ 2, 10, *see State v. Krzak*, 97 R.I. 156, 196 A.2d 417 (1964), to "act in relation to the property, affairs and government of any city or its own town by general laws which shall apply alike to all cities and towns," R.I. Constitution Art., XXVIII, § 4, *see Nugent v. City of East Providence*, 103 R.I. 518, 238 A.2d 758 (1968), and to exercise sole legislative responsibility in the field of education, R.I. Constitution, Art. XII, *see Brown v. Elston*, 445 A.2d 279 (R.I.1982). Just as there was no question that the General Assembly was vested with the power, under state law, to enact the health insurers' prohibition, so there is no question here that the Assembly has the state law power to enact the municipal prohibition. Properly characterized, the question here, as with the health insurers' prohibition, is whether the state has exercised its broad legislative powers consistent with the strictures of the federal Constitution.

The federal constitutional question whether a state may prohibit its municipalities from using municipal funds to provide municipal employees with insurance benefits covering abortion appears to be a question of first impression. No case cited by the parties, nor discovered by the court, has applied the Supreme Court's prior public funding cases to a state legislative scheme compelling separate governmental entities to withhold funds, nor to a scheme involving employee benefits rather than public welfare subsidies. Accordingly, in resolving this difficult issue, I must look directly to *Maher* and *Harris* to determine whether the rationale invoked in those cases applies equally to the subject legislation.

As I discussed with respect to the health insurers' prohibition, the linchpin in the Court's reasoning was the distinction between the state's creation of an obstacle to abortion, which is impermissible under the Constitution, and the state's refusal to remove an existing obstacle, which is not constitutionally impermissible. The facts surrounding the municipal prohibition indicate that, as with the health insurers' prohibition, the state has itself created the financial obstacle.

The employer involved here, a school committee, is unquestionably a separate entity from the state. For federal constitutional purposes, local governmental units are frequently considered bodies separate and distinct from the state. *See Mount Healthy Board of Education v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977) (school board not accorded Eleventh Amendment immunity enjoyed by state); *Moor v. County of Alameda*, 411 U.S. 693, 721, 93 S.Ct. 1785, 1801, 36 L.Ed.2d 596 (1973) (county considered "person" for purposes of diversity jurisdiction, while state is not). Moreover, undertaking the analysis utilized in *Mount Healthy* and *Moor*, looking to the state law attributes of the local body to determine whether the state and local entities should be considered distinct, it is clear that the defendant school committee is a separate entity. As the Rhode Island Supreme Court has explained:

the cities and towns, through *their* school committees, perform a state function based upon a delegation of power from the General Assembly. Thus, the school committees, although exercising a portion of the state's power over education, are, nonetheless, municipal bodies, and their employees, including public school teachers, are municipal employees ... school committees are not state agencies; they are municipal bodies acting as

agents for the state in that they exercise state power that has been delegated to them by the state.

*Cummings v. Godin,* 377 A.2d 1071, 1073 (R.I.1977); *accord Brown v. Elston,* 445 A.2d 279, 285 (R.I.1982).

To note that the school committee is a separate entity for purposes of federal (and state) law is not to suggest that the state does not exercise sovereign powers over such entities under state law. As I have noted, it is beyond gainsaying that under state law, the state exercises supreme responsibility in the arena of education. *See* R.I.Const.Art. XII. Rather, the separate character of the entities is, in my judgment, critical in deciding whether the state has impermissibly created an obstacle to abortion within the meaning of *Maher* and *Harris.* For what the state has done through the municipal prohibition is legislatively to withdraw from the school committee a portion of the power it had delegated to the committee. The parties fully agree that, absent this legislation, the school committees had no plan to eliminate the benefits in question. Stip. III, ¶ 13(f). The parties further agree that, absent this legislation:

> The State of Rhode Island's approval, authority or permission is not necessary before a school committee or municipality within the State of Rhode Island can make employment decisions as to: (a) hiring and selection of employees; (b) salary; (c) fringe benefits; (d) work assignments; (e) other terms and conditions of employment; (f) duration of employment; (g) discipline of employees; (h) termination of employees; (i) collective bargaining and entry into collective bargaining agreements with certified bargaining representative of employees. Stip. III, ¶ 25.

Insofar as the statute would withdraw from the school committee discretion otherwise allocated to it to fix wage and benefit packages, it is similar to the health insurers' prohibition, in which the state sought to withdraw from all health insurers the discretion they normally enjoy in setting health insurance premium rates. As I concluded with respect to the health insurers' prohibition, I conclude here that this exercise of the state's legislative power compels a separate entity to restrict or eliminate the availability of insurance covering abortion and, in so doing, creates an "obstacle" to abortion that was not "already there," *Maher,* 432 U.S. 464, 474, 97 S.Ct. 2376, 2382.

I recognize that the health insurers' prohibition reaches private funds, while this statute concerns only "public" funds, and that the two statutes might be constitutionally distinguished on that basis. The record indicates, however, that only *municipal* funds, and not the state's own funds, finance the benefits in question. *See* Stip. III, ¶ 23. Nothing in *Maher* or *Harris* suggested that a state could, consistent with the Constitution, decree that no public funds, controlled by *any entity,* could be spent for abortion-related uses. Indeed, those decisions spoke of the "allocation" of funds, suggesting that the funding prerogative enjoyed by the state was, by definition, confined to those funds which it typically "allocated." Moreover, in *Maher* and *Harris,* the public funds in question were to be used for public *subsidy* of abortions through welfare assistance programs. Here, the funds are used to remunerate employees for services rendered. Nothing in *Maher* or *Harris* indicated that the state could, under color of those decisions, dictate to separate, governmental employers that they must, in effect, reduce the wage-benefit packages of only those employees who wish to exercise their right to abortion. Yet upholding the municipal prohibition would uphold just such a state edict.

Accordingly, I hold that Rhode Island has created an obstacle to abortion that was not "already there." *Maher, supra,* 432 U.S. at 474, 97 S.Ct. at 2382. The state has, therefore, exceeded the limits of *Maher* and *Harris* by legislatively compelling separate governmental employers to exclude abortion benefits. Accordingly, the statute must be subject to the scrutiny mandated by *Roe v. Wade* and its progeny. Because the statute affects all three tri-

mesters, *see Women's Medical Center v. Roberts, supra,* strict scrutiny must be applied to it. Strict scrutiny is warranted, in any event, because, for the same reasons set forth with respect to the health insurers' prohibition, the impact of the statute on the abortion rights of female employees is sufficiently "significant" to trigger strict scrutiny. Indeed, the impact is unquestionably more significant here because this statute flatly bans insurance coverage for abortions, rather than merely imposing a surcharge on or restricting the availability of the coverage—as the health insurers' prohibition does. I hold further that neither of the two compelling interests recognized by the Supreme Court are present here. Accordingly, the municipal prohibition is unconstitutional.

## V. CONCLUSION

There being no genuine issue as to any material fact, plaintiffs are entitled to summary judgment as a matter of law on the ground that both R.I.G.L. § 27–18–28 and R.I.G.L. § 36–12–2.1, insofar as it applies to municipalities, violate the First, Fourth, Ninth and Fourteenth Amendments to the United States Constitution. I incorporate into this judgment my prior temporary restraining orders and rule that the defendants shall be permanently enjoined, in all the respects enumerated in those orders, from enforcing the statutes.

An Order will be prepared accordingly.